810 A.2d 571 (2002)
355 N.J. Super. 328
MERIDIAN QUALITY CARE, INC., Plaintiff-Appellant,
v.
BOARD OF ADJUSTMENT OF the TOWNSHIP OF WALL, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 7, 2002.
Decided November 22, 2002.
*573 Peter J. Carton, Newark, argued the cause for appellant (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Carton, on the brief with Gregory R. Alvarez).
Thomas J. Hirsch, Ocean, argued the cause for respondent (Mr. Hirsch, on the brief).
Before Judges HAVEY, WELLS and PAYNE.
*572 The opinion of the court was delivered by HAVEY, P.J.A.D.
Plaintiff Meridian Quality Care, Inc. (Meridian) appeals from a judgment sustaining the denial of its conditional-use variance and site plan applications by defendant Board of Adjustment of the Township of Wall (Board). Meridian seeks to construct an assisted living, skilled nursing facility on its site, situate in a zone district designating such a facility as a permitted, conditional use. A variance was required under N.J.S.A. 40:55D-70d(3) because Meridian could not comply with the conditional-use standard requiring access to a secondary arterial road. After Meridian bifurcated its application, see N.J.S.A. 40:55D-76b, the Board granted the conditional-use variance, conditioned upon approval of Meridian's site plan. The Board rejected the site plan because of concerns about noise levels and odors emanating from the proposed facility. It therefore denied both the conditional-use variance and site plan applications.
We reverse. In a bifurcated application, the Board may grant a use variance under N.J.S.A. 40:55D-70d, conditioned upon grant of a subsequent site plan application. However:
No such subsequent [site plan] approval shall be granted unless such approval can be granted without substantial detriment to the public good and without substantial impairment of the intent and purpose of the zone plan and zoning ordinance.

[N.J.S.A. 40:55D-76b.]
This language tracks the negative criteria language found in N.J.S.A. 40:55D-70d. In this case, the Board failed to apply the modified standard of review as to the negative criteria governing conditional-use variance applications. See Coventry Square, Inc. v. Westwood Zoning Bd. of Adjustment, 138 N.J. 285, 298-99, 650 A.2d 340 (1994). It also exceeded the appropriate scope of review in denying the site plan application. Thus, its denial of Meridian's applications was arbitrary, capricious and unreasonable.

*574 I
Meridian is the owner of a 13.729 acre parcel of vacant land designated as block 267, lot 11, on the Wall Township Tax Map. The subject property is situate in the OP-2 (office park) zone district. It adjoins: (1) New Jersey State Highway 138 to the south; (2) vacant land characterized as freshwater wetlands to the west; (3) a single-family residential development to the north; and (4) New Bedford Road to the east. The Township's zoning ordinance denotes "Nursing and Personal Care Facilities," as permitted, conditional uses in the OP-2 zone.
Meridian applied to the Board for a conditional-use variance, site plan approval and two minor bulk variances to construct a 130-bed assisted living, skilled nursing care facility on the site. A conditional-use variance was necessary because Meridian was not able to meet the ordinance standard requiring the site to have direct access to a "secondary arterial road." State Highway 138, abutting the site, is a designated secondary arterial road. However, Meridian was unable to secure an access permit from the State Department of Transportation because of the site's proximity to the New Bedford Road and Route 18 jug handle. Therefore, Meridian's only means of ingress and egress is New Bedford Road.
Meridian's proposed two-story, 56,184 square-foot structure is of residential design so as to harmonize with the residential neighborhood to the north of the site. The front of the facility and main entrance face State Highway 138. Sixty-four of the proposed ninety-four parking stalls and a detention basin are situate in the front, southerly side of the proposed building. To the north, or rear of the building, twenty parking stalls are planned.[1] Also to the rear of the building the plan envisions passenger-loading and ambulance drop-off areas, a delivery truck loading zone, an electrical transformer and switch gear, and a garbage compactor covered by a concrete enclosure. A Meridian representative testified that there would be no more than four truck deliveries per week, and that, based on Meridian's prior experience at other facilities, she expected only one ambulance visit per month.
The Township's land use regulations require a minimum buffer of fifty feet. However, Meridian's plan calls for a seventy-five foot buffer, including a fifty-foot shade tree and vegetation area along the northerly lot line for the purpose of creating a "visual break" between the proposed structure and the residential dwellings to the north. Meridian also agreed to construct a six-foot board-on-board fence along the entire northerly boundary line.
The planned entrance to the facility is on the north-east corner of the site off New Bedford Road. A twenty-five foot wide driveway circles the proposed structure.[2] The site plan provides for a ten-foot dedication on the westerly side of New Bedford Road in order to create a turning lane into the site.
Objectors, residents in the neighborhood to the north of the site, expressed concern about excessive noise from the exterior electrical equipment and individual air conditioners of the residents, truck traffic, and odors that may emanate from the facility's kitchen. Between the successive five hearings conducted on the application, *575 Meridian representatives met with the Board's Technical Review Committee to address these concerns and others raised by Board members.
During the second night of the hearing, Meridian's counsel advised the Board that Meridian was bifurcating its conditional-use variance and site plan applications so that it could proceed with the variance application while it modified its site plan to address the concerns raised by the objectors and Board members. The matter proceeded as a bifurcated case, with the understanding that any approval of the conditional-use variance would be conditioned upon the Board's consideration of the revised site plan submitted by Meridian.
John Rea, Meridian's traffic expert, testified that Meridian's inability to meet the arterial road condition of the zoning ordinance was of no consequence because New Bedford Road, to which Meridian had access, was essentially an arterial road because of its heavy traffic flow. Meridian's engineer, Jeromie Lange, described the revisions to the site plan. At the request of the Technical Review Committee, the six-foot board-on-board fence was relocated from the northerly property line to south of the fifty-foot tree and vegetation buffer. The exterior generator and switch gear were moved further south toward the proposed structure. The garbage compressor was moved from the north to the south side of the loading zone. At some point Meridian also agreed to a recommendation by the Technical Review Committee to relocate a row of parking stalls from the northerly part of the site to its south-easterly corner.
Meridian's architect and engineer addressed at length comments from Board members and objectors that the structure should be reversed or "flipped," redesigned, reduced in size, or moved toward the westerly boundary line. The experts explained that such changes were contrary to sound planning, counterproductive, or prevented by environmental constraints.
By written resolution, the Board denied the site plan and, "[i]n light of the fact that the approval of the [conditional] use variance was conditioned on the approval of the site plan, the [conditional] use variance is also denied." The Board acknowledged that Meridian's proposal was an inherently beneficial use. However, it noted that Meridian's application had been bifurcated and that the Board "could grant a variance for the one condition that [Meridian] failed to meet for this conditional use, subject to an appropriate site plan that would not adversely impact the surrounding properties."
The Board concluded that Meridian had "failed to meet its burden of establishing that the use, implemented through the proposed site plan, would not create a substantial detriment to the neighboring residential properties." Specifically, "[t]he Board believed that the negative impacts could be reduced by the imposition of conditions essentially requiring some re-design of the site to move the offensive elements of the site further from the adjoining residential properties." It added that "because the Board found that the applicant failed to establish that the proposed layout of the site would not constitute a substantial detriment and because applicant refused to offer alternative layouts, the Board is compelled to deny the application." The Board also based its denial on the fact that Meridian refused to present additional expert testimony regarding the Board's concern with respect to noise levels relating to the electrical equipment in residents' air conditioners, and odors emanating from the facility's kitchen.
*576 In affirming the Board's denial, the trial court cited N.J.S.A. 40:55D-76b governing bifurcated cases, and upheld the Board's determination that Meridian's facility could be redesigned to eliminate the negative impact that noise and odors will have on the surrounding community, observing that, "[t]he Board, as members of the community, are in the best position to evaluate the concerns of the community."

II
It is well settled that a court may not "substitute its judgment for that of a board `even when it is doubtful about the wisdom of the action.'" Cell So. of New Jersey v. Zoning Board of Adjustment, 172 N.J. 75, 81, 796 A.2d 247 (2002) (quoting Cellular Tel. Co. v. Zoning Bd. of Adjustment, 90 F.Supp.2d 557, 563 (D.N.J.2000)). Courts will defer to the board's decision if it is "supported by the record and is not so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion." Smart SMR of N.Y. Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327, 704 A.2d 1271 (1998).
Meridian argues that the Board's denial of its conditional-use variance and site plan applications was arbitrary, capricious and unreasonable. Specifically, it contends that, in denying the conditional-use variance, the Board improperly considered design factors of its site plan that were unrelated to the deviation from the secondary arterial road access standard under the ordinance. Further, it asserts that the Board arbitrarily exceeded its circumscribed role in denying Meridian's site plan application. We agree with both points.

III
The Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -136, defines a conditional use as:
a use permitted in a particular zoning district only upon a showing that such use in a specified location will comply with the conditions and standards for the location or operation of such use as contained in the zoning ordinance, and upon the issuance of an authorization therefor by the planning board.

[N.J.S.A. 40:55D-3.]
Prior to enactment of the MLUL, the conditional-use concept was recognized as a "special exception" under N.J.S.A. 40:55D-39b (now repealed). The basic difference between a "special exception" under the zoning ordinance and a nonpermitted use requiring a variance was that the "former [was] legislatively permitted in a zone subject to the controls whereas the latter [was] legislatively prohibited but may be allowed for special reasons." Verona, Inc. v. Mayor of West Caldwell, 49 N.J. 274, 282, 229 A.2d 651 (1967). That conceptual difference survived passage of the MLUL. See Cardinal Properties v. Borough of Westwood, 227 N.J.Super. 284, 287, 547 A.2d 316 (App.Div.1988) (a conditional use is "suitable to a zoning district but not to every location within that district"). The MLUL recognized the distinction by shifting jurisdiction over "fully complying conditional uses" to the planning board. Coventry Square, supra, 138 N.J. at 294, 650 A.2d 340. See N.J.S.A. 44:55D-67a.
If a development plan is not fully compliant with the conditional-use standards under the ordinance, the applicant must obtain a special reasons, or use variance, from the zoning board under N.J.S.A. 40:55D-70d(3). In order to obtain such relief, the applicant must prove both the so-called positive and negative criteria. In the traditional nonpermitted use case, the positive criteria require a showing that there are "special reasons" for granting the variance. Medici v. BPR *577 Co., 107 N.J. 1,14-18, 526 A.2d 109 (1987). The positive criteria are presumptively satisfied if the proposed use is inherently beneficial. Smart SMR of N.Y., supra, 152 N.J. at 323, 704 A.2d 1271. This is so because such uses, by their very nature, serve the general welfare. See Medici v. BPR Co., supra, 107 N.J. at 12-13, 526 A.2d 109 (and cases cited therein).
The negative criteria for a use variance require proof that the variance can be granted "without substantial detriment to the public good" and that it "will not substantially impair the intent and purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70d. Compare application of the negative criteria to traditional nonpermitted commercial uses, Medici, supra, 107 N.J. at 21-22, 526 A.2d 109, with nonpermitted uses that are inherently beneficial. Sica v. Board of Adjustment, 127 N.J. 152, 164-66, 603 A.2d 30 (1992).
In Coventry Square, supra, 138 N.J. at 297, 650 A.2d 340, our Supreme Court determined that the special reasons standard applied to nonpermitted uses is "plainly inappropriate" in the context of conditional-use variances. This is so because of the "significant differences between prohibited uses, on the one hand, and conditional uses that do not comply with one or more of the conditions imposed by an ordinance, on the other hand." Ibid. When dealing with nonpermitted uses, "the high standard of proof required to establish special reasons for a use variance is necessary to vindicate the municipality's determination that the use ordinarily should not be allowed in the zoning district." Ibid.
However, in the case of conditional uses, the municipality has already decided that the use is permitted in the zoning district, subject to conditions. Ibid. Thus, a conditional-use applicant's inability to comply with one or more of the ordinance's conditions "need not materially affect the appropriateness of the site for the conditional use." Ibid. Consequently, the standard of proof to support a conditional-use variance "should be relevant to the nature of the deviation from the ordinance." Id. at 297-98, 650 A.2d 340 (emphasis added).
The Court held that the standard as to the positive criteria applicable to conditional-use variances requires proof:
sufficient to satisfy the board of adjustment that the site proposed for the conditional use, in the context of the applicant's proposed site plan, continues to be an appropriate site for the conditional use notwithstanding the deviations from one or more conditions imposed by the ordinance.

[Id. at 298, 650 A.2d 340.]
The standard focuses:
both the applicant's and the board's attention on the specific deviation from conditions imposed by the ordinance, and will permit the board to find special reasons to support the variance only if it is persuaded that the non-compliance with conditions does not affect the suitability of the site for the conditional use.
[Id. at 298-99, 650 A.2d 340 (emphasis added).]
The negative criteria, as well, are modified:
In respect of the first prong of the negative criteria, that the variance can be granted "without substantial detriment to the public good," N.J.S.A. 40:55D-70, the focus is on the effect on surrounding properties of the grant of the variance for the specific deviations from the conditions imposed by ordinance. "The board of adjustment must evaluate the impact of the proposed [conditional-] use variance upon the adjacent properties and determine whether or not it will *578 cause such damage to the character of the neighborhood as to constitute `substantial detriment to the public good.'" Medici, supra, 107 N.J. at 22 n. 12, 526 A.2d 109 (quoting Yahnel, supra, 79 N.J.Super. at 519, 192 A.2d 177 (explaining weighing function of board of adjustment in respect of negative criteria)). In respect of the second prong, that the variance will not "substantially impair the intent and purpose of the zone plan and zoning ordinance," N.J.S.A. 40:55D-70(d), the board of adjustment must be satisfied that the grant of the conditional-use variance for the specific project at the designated site is reconcilable with the municipality's legislative determination that the condition should be imposed on all conditional uses in that zoning district.
[138 N.J. at 299, 650 A.2d 340 (emphasis added).]
It is undisputed that Meridian satisfied the positive criteria in this case, even under the traditional test applicable to a nonpermitted use. In its resolution the Board determined that Meridian's proposed assisted living, skilled nursing facility, was an inherently beneficial use. We are satisfied as well that Meridian satisfied the modified test under Coventry Square. The uncontradicted testimony from Meridian's engineer, architect and traffic expert, established that deviation from the secondary arterial road access requirement will not in any way affect the suitability of the site for the proposed conditional use. The essence of the traffic expert's testimony was that use of New Bedford Road will not alter or diminish the services to be provided by Meridian's proposed facility, approval of which presumptively will serve the general welfare and promote the public good. Meridian Hosps. Corp. v. Borough of Point Pleasant, 325 N.J.Super. 490, 499, 739 A.2d 999 (App.Div.1999), certif. denied, 163 N.J. 80, 747 A.2d 287 (2000); Urban Farms, Inc. v. Borough of Franklin Lakes, 179 N.J.Super. 203, 212, 431 A.2d 163 (App.Div.), certif. denied, 87 N.J. 428, 434 A.2d 1099 (1981).
A determination as to whether Meridian met the Coventry Square modified, negative criteria standard is complicated by the fact that during the hearings Meridian bifurcated its conditional-use variance and site plan applications. N.J.S.A. 40:55D-76b provides that:
The developer may elect to submit a separate application requesting approval of the variance and a subsequent application for any required approval of a subdivision, site plan or conditional use. The separate approval of the variance shall be conditioned upon grant of all required subsequent approvals by the board of adjustment. No such subsequent approval shall be granted unless such approval can be granted without substantial detriment to the public good and without substantial impairment of the intent and purpose of the zone plan and zoning ordinance.

[Emphasis added.]
As noted earlier, the underscored language tracks the negative criteria language found in N.J.S.A. 40:55D -70d.
On its face, N.J.S.A. 40:55D-76b is problematical because it appears to require the developer to satisfy the negative criteria twice; once when the use variance is granted, and again when its subsequent site plan is submitted. Further, while the statute appears to allow the developer to bifurcate without the board's consent, such a procedure may not be appropriate if the board considers the use variance and site plan issues so interrelated that both applications should be considered in a single administrative proceeding, at which the board would decide the negative criteria based on the entire plan submitted. See *579 William M. Cox, New Jersey Zoning and Land Use Administration § 8.3 at 224 (Gann, 2002); and see Scholastic Bus Co., Inc. v. Zoning Bd. of Adjustment, 326 N.J.Super. 49, 58, 740 A.2d 657 (App.Div.1999) (vacating bifurcation and remanding for board's consideration of the use variance and site plan applications in a consolidated proceeding).
In any event, what is clear is that, if the applications are bifurcated, the board reserves the right to revisit the negative criteria upon submission of the site plan. By providing in N.J.S.A. 40:55D-76b that "[t]he separate approval of the variance shall be conditioned upon grant of all required subsequent approvals ...," the Legislature recognized that the proofs submitted in support of the use variance may not be sufficient for the board to decide whether the negative criteria under N.J.S.A. 40:55D-70d have been met.
The detailed design submitted during the site plan phase of a bifurcated application may be highly relevant in deciding the negative criteria issue. On-site and even off-site factors such as traffic flow, buffers, ingress and egress, traffic congestion, drainage, building orientation, the nature of the surrounding properties, and other factors may be significant in deciding whether the variance may be granted without substantial detriment to the surrounding neighborhood and public good, and without substantially impairing the intent and purpose of the zone plan and zoning ordinance. N.J.S.A. 40:55D-70d; N.J.S.A. 40:55D-76b. Such an analysis is entirely correct when the conditionally approved use variance involves a nonpermitted use. See Allocco & Luccarelli v. Township of Holmdel, 299 N.J.Super. 491, 498-99, 691 A.2d 430 (Law Div.1997).
The problem in this case is that the Board applied the negative criteria under N.J.S.A. 40:55D-76b as if Meridian's special reasons variance application was for a nonpermitted use, rather than a permitted, conditional use. In its written resolution, the Board stated that it "voted separately on the use variance aspect of the case and approved the use variance subject to the approval of the site plan and the determination that the site plan would not create any substantial detriment to the surrounding properties." (Emphasis added). Specifically, referring to the site plan, the Board was concerned with the:
layout of the building and the site because it was placing the loading and unloading areas, garbage pickup, generator and cooking facilities to the rear of the site, which was the closest portion of the site to the adjoining residential homes.
Therefore, the bulk of traffic noise and odors would be directed to the rear of the site in the direction of the adjoining residential homes.
During the hearings as well, Board members and the public focused on the details of the site plan regarding design of the structure, noise and odor. By focusing on these factors the Board failed to recognize the modified standard applicable to conditional-use variances defined by Coventry Square.
As noted, in the conditional-use variance context, the first prong of the negative criteria, whether the variance can be granted without "substantial detriment to the public good," N.J.S.A. 40:55D-70d, "the focus is on the effect on surrounding properties of the grant of the variance for the specific deviations from the conditions imposed by the ordinance." Coventry Square, supra, 138 N.J. at 299, 650 A.2d 340 (emphasis added). Here, the single "specific deviation[ ]" is Meridian's inability to provide access to a secondary arterial road. The record is utterly void of any competent proof, expert or otherwise, *580 to rebut the testimony of Meridian's experts that deviation from this single condition will not cause "substantial detriment to the public good." The Board, in its resolution, did not even intimate that the design layout of the proposed building, noise levels from the transmission and air conditioners, or odors from the kitchen were related to the deviation from the arterial road condition.
Nor was there any finding, or even any factual basis for a finding, that access to New Bedford Road will create a traffic hazard or otherwise be detrimental to the public good. Meridian's traffic expert testified that Meridian's proposed use would generate virtually no traffic from its residents. He anticipated at most forty-eight "trips" during the weekly peak hour on Saturday afternoons, and compared this rate to 125-150 trips at peak hours if an office building, a permitted use in the zone, was constructed of comparable size. Neither the objectors nor the Board presented any competing data or other proof that this single deviation will adversely impact on the surrounding properties.
Meridian also met the second prong of the negative criteria: whether deviation from the arterial road condition would "substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70d. That prong requires the Board to decide if the grant of the variance "for the specific project at the designated site is reconcilable with the municipality's legislative determination that the condition should be imposed on all conditional uses in that zoning district." Coventry Square, supra, 138 N.J. at 299, 650 A.2d 340. Meridian's traffic expert squarely addressed that point. Rea testified that the absence of an arterial road access in this case was inconsequential because New Bedford Road, the site's only proposed means of access, was essentially an arterial road because of its "substantial traffic volumes." The Board accepted Rea's testimony and implicitly found that granting of the variance was "reconcilable with [the governing body's] determination that the condition should be imposed on all conditional uses" in the OP-2 zone. Ibid. In its resolution, it stated:
The Department of Transportation will not permit applicant to use Highway 138 for access and, therefore, applicant must use New Bedford Road for its ingress and egress. New Bedford Road is a heavily trafficked road in Wall Township and the road is a major connector from Highway 35 to Belmar Blvd.
New Bedford Road intersects Highway 138 which road connects to State Highway 195 and, therefore, there is very heavy traffic on this road especially at the intersection of New Bedford Road and Highway 138.
The applicant's traffic expert testified that New Bedford Road essentially functions as a secondary arterial road, and that because DOT will not allow access to Highway 138, this is the only ingress and egress that applicant can obtain for the site.
Therefore, the Board found that it could grant a variance for the one condition that applicant failed to meet for this conditional use, subject to an appropriate site plan that would not adversely impact the surrounding properties.
Nevertheless, in its appellate brief, the Board argues that the deviation from the arterial road standard in fact "affects the orientation of the building," thus creating the "activities" and "disturbance" found offensive to Board members and the public. However, no such finding was made by the Board. Further, as Meridian points out, had it been able to comply with the conditional-use standard by providing access to Route 138, the orientation of the *581 building would have been exactly the same as provided under its proposed site plan. Consequently, there is no rational nexus between the deviation from the arterial road condition and the "orientation" of the proposed structure. We conclude that there was no factual or legal basis for denial of Meridian's conditional-use variance application.

IV
What is left is the question whether the Board's denial of Meridian's site plan was arbitrary, capricious and unreasonable. We agree with Meridian that, once it is determined that it is entitled to the conditional-use variance, its facility must be deemed a permissible use, and thus the "traditional" site plan review standard applies.
It is well settled that a board's role in considering a site plan application is circumscribed. In Shim v. Washington Twp. Planning Bd., 298 N.J.Super. 395, 411, 689 A.2d 804 (App.Div.1997), we described the scope of review as follows:
A planning board's role in considering a site plan application is circumscribed. The object of site plan review is to assure compliance with the standards under the municipality's site plan and land use ordinances. Generally, the Board concerns itself with on-site conditions. N.J.S.A. 40:55D-38, -39 and -41. But see N.J.S.A. 40:55D-42 (municipality may, by ordinance, require applicant to pay pro-rata share of off-site improvements necessitated by site plan). Thus, ordinarily, the denial of a site plan application would be a "drastic action" when the pertinent ordinance standards are met. Cox, supra, at § 15-10 at 289, see also Dunkin' Donuts of New Jersey, Inc. v. Township of North Brunswick, 193 N.J.Super. 513, 515, 475 A.2d 71 (App.Div.1984) (when applicant meets site plan ordinance standards, application may not be denied because of off-site conditions); Lionel's Appliance Ctr., Inc. v. Citta, 156 N.J.Super. 257, 269, 383 A.2d 773 (Law Div.1978) (same). While site plan review gives the Board wide discretion to assure compliance with the objectives and requirements of the site plan ordinance, "it `was never intended to include the legislative or quasi-judicial power to prohibit a permitted use.'" PRB Enter., Inc. v. South Brunswick Planning Board, 105 N.J. 1, 7, 518 A.2d 1099 (1987) (quoting Lionel's Appliance Ctr., Inc., supra, 156 N.J.Super. at 264, 383 A.2d 773).
See also Sartoga v. Borough of West Paterson, 346 N.J.Super. 569, 581-82, 788 A.2d 841 (App.Div.) (same), certif. denied, 172 N.J. 357, 798 A.2d 1270 (2002); W.L. Goodfellows & Co. of Turnersville, Inc. v. Washington Twp. Planning Bd., 345 N.J.Super. 109, 116, 783 A.2d 750 (App.Div.2001) (same). In a closely-related context, the review of a subdivision application, the Supreme Court in Pizzo Mantin Group v. Township of Randolph, 137 N.J. 216, 228-29, 645 A.2d 89 (1994), held that a planning board's role is also limited. It observed:
The Appellate Division in this case concluded that under the MLUL a planning board does not have the broad authority to consider a subdivision application in light of the general welfare or of the purposes of zoning under the MLUL or general principles of sound planning apart from the standards of applicable local subdivision and zoning ordinances. It found that if a proposed subdivision complies with local ordinances and the MLUL, then a planning board "`shall... grant preliminary approval.'" 261 N.J.Super. at 666, 619 A.2d 676 (quoting N.J.S.A. 40:55D-48) (emphasis omitted). It found that the MLUL, unlike the *582 Planning Act, did not give planning boards the general power to require that subdivisions not pose a danger to public health or safety. According to the Appellate Division, N.J.S.A. 40:55D-2, which sets forth the general purposes of the MLUL, "was not a codification of standards for the purpose of guiding planning boards in the review of particular subdivision applications. Rather, it provides a framework, together with N.J.S.A. 40:55D-48, from which general guidelines and particular standards should be devised by the governing body." Id. at 667, 619 A.2d 676.
....
We concur generally in the Appellate Division's analysis and interpretation of the MLUL. The MLUL evinces a legislative design to require consistency, uniformity, and predictability in the subdivision-approval process. The legislative scheme contemplates that a planning board's review of a subdivision proposal, including the layout of the entire design, must be made within the framework of the standards prescribed by the subdivision and, if pertinent, the zoning ordinances.

[Id. at 228-29, 645 A.2d 89.]
Here, the Board did not engage in a comparison of the proposed site plan with specific, relevant standards under the site plan ordinance or other pertinent land use regulations. Indeed, not a single provision of the Township's site plan ordinance or other municipal regulation is cited in the Board's resolution. Instead, the Board focused, in our view erroneously, exclusively on N.J.S.A. 40:55D-76b in deciding that the details of the site plan would create a substantial detriment to the surrounding properties. Based on our independent review of the record, we conclude that there are no facts to support denial of the site plan application.
First, the Board's engineer presented two reports outlining a number of site-plan requirements implicated in this case. Meridian addressed and satisfied each of those requirements. Second, during the extensive hearings, Meridian fine-tuned its site plan after meetings with the Board's Technical Review Committee in order to satisfy the Committee's recommendations and concerns expressed by Board members and objectors. Under the plan, the proposed structure is well within the building and impervious surface coverage requirements. All bulk standards, except for two, were met.[3] The buffer provided is seventy-five feet, rather than the required fifty feet. Parking, ingress and egress, traffic circulation, drainage, curbing and other on-site factors were addressed in detail by Meridian's experts. No challenge to that testimony was received.
The Board now cites § 500B4.a(1) of the Township's Land Use and Development Regulations as the predicate legislative standard justifying denial of the site plan. *583 That provision entitled "Layout and Orientation" provides in pertinent part:
(a) All buildings shall be located with proper consideration of their orientation and relationship to other buildings, both existing and proposed in terms of light, air and usable open space, access to public right-of-way and off-street parking; height and bulk; drainage and existing topography; trees and vegetation; and other natural features and land forms.
(b) Development shall be designed to provide protection of the development from potentially adverse surrounding influence, and protection of surrounding areas from potentially adverse influence within the development.
The Board reasons that under this provision it had the right to require Meridian to redesign or reduce the size of the structure in order to eliminate the noise, odor and other activities it claims may have an adverse impact on the neighboring residents.
As stated, during the hearings Board members and objectors pressed Meridian to redesign the size of its facility. Specifically, Board members and objectors suggested that Meridian reverse the building so that the front entrance would face northerly, and the back would face Route 138. "[F]lipping" the building, Board members reasoned, would allay the objectors' concerns about the offending "activities" in the rear of the site. At another point, Board member Grasso suggested that the facility be reduced in size or redesigned so that the kitchen and other potentially offending activities are located in the westerly wing of the structure. He criticized Meridian for presenting a "cookie-cutter" approach by presenting a generic plan instead of designing a layout that would minimize the detrimental effect to surrounding properties. Another member suggested that the entire structure be moved further to the west in order to reduce the residents' concerns.
We need not attempt to determine whether the "standards" under § 500B4.a(1) of the Development Regulations are sufficient to provide a board with the requisite discretion in some circumstances to deny a site plan application. We note only that reliance on the nonspecific language of such a regulatory standard may unduly repose unfettered discretion in the board, and thus invite arbitrary action. See Pizzo Mantin Group, supra, 137 N.J. at 229, 645 A.2d 89 ("the absence of express standards may invite inconsistency, encourage controversy, and lead to arbitrary action by the planning authority").
In any event, in this case it is telling that no mention is made of § 500B4.a(1) in the Board's resolution. More to the point, even if § 500B4.a(1) may be considered, Meridian's engineer and architect addressed the "orientation" and design issues. First, both experts rejected the suggestion that the building be reversed. They stated that sound planning calls for facing the front-building facade and building entrance toward the main, adjacent thoroughfare. In addition, Meridian's engineer explained that "flipping" the building would in fact be counterproductive. He testified:
there is quite a bit of activity that is proposed along the front of the building. Although in testimony tonight we've basically been discussing activity in the rear. There is a significant portion of the site, just graphically looking at it, in excess of two thirds of the parking is located toward the front of the building as well as the main entrance to the facility.

*584 So by flipping it, you would not necessarily get the desired effect of sending the activity or the primary activity to the other side of the building.
As to the suggestion that Meridian reduce the size of its facility, the Board has not provided us with any legal authority for the proposition that a board may require, on a site plan review, the applicant to reduce the size of a permitted facility when the application meets all of the bulk requirements of the zoning ordinance.[4]
As to the suggestion that Meridian redesign the building to place the offending activities in a westerly wing. Meridian's architect explained how Meridian had designed the building to accommodate the special needs of the elderly patients. He stated that it was sound planning to place the "core functions" such as kitchen, eating and recreational facilities in the center of the structure, so that elderly, and often handicapped residents, would have easy access to them. Relocating the core functions to the west of the building would create "excessively long corridors" and inconvenience to the residents. Finally, the engineer testified in detail that the facility could not be moved in a westerly direction because of stream encroachment, flood plain, and wetlands constraints. No competent evidence, expert or otherwise, was submitted challenging the testimony of the architect or engineer. See Cell, supra, 172 N.J. at 87, 796 A.2d 247 ("`[p]roof of an adverse effect on the adjacent properties and on the municipal land use plan ... generally will require qualified expert testimony'"; quoting Smart SMR of N.Y., Inc., supra, 152 N.J. at 336, 704 A.2d 1271).
The Board also denied the site plan application because Meridian did not present additional expert testimony regarding noise levels emanating from the exterior electrical equipment and individual air conditioning units, and odor from the kitchen facilities "that would emanate from a facility serving 130 residents."
However, Meridian's experts addressed the noise and odor issues in detail. Meridian's engineer testified that the noise from the exterior transformer and switch box would be "de minimus." He also presented a report regarding decibel levels expected from the equipment and resident air conditioners, and explained that all fell far below accepted levels under the local ordinance and State law.
As to the odor concern, one Board member expressed fear that odors similar to those emanating from fast-food restaurants may result from the proposed facility. Meridian's architect explained that Meridian's facility will have planned menus, rather than the all-day frying and grilling that occurs in such facilities. He also advised the Board that the kitchen facility had been redesigned to place exhausts fans at roof level facing vertically, rather than horizontally toward the surrounding residential neighborhood. Meridian also submitted the report of John Birchfield, a food service design engineer, who indicated that placement of the air vents and blowers on the roof facing vertically would dissipate any odors from the kitchen. He added that food odors that are offensive are ordinarily associated with fried foods with high volumes of grease and smoke emanating *585 from the facility. This type of odor will not emanate from Meridian's facility because it planned a nutritionally-balanced diet for the residents. He concluded that there would be no odor emission problem caused by the kitchen facilities.
In our view, denial of the site plan application on the basis that additional expert testimony should have been presented was unwarranted. As Meridian points out, its uncontradicted testimony and reports establish that "no nonconforming noise [or] odors will be generated by the proposed facility." Consequently, despite the Board's right to request additional expert testimony regarding a component of the site plan, it was arbitrary, capricious and unreasonable to deny the application on that basis. Meridian's representatives have agreed to comply with every local and State governing standard respecting both decibel levels and odor emissions. In our view, these issues may be addressed by imposition of reasonable conditions, and, if necessary, appropriate enforcement by zoning officials. Meridian has acknowledged its willingness to abide by such conditions. We remand to the Board for that purpose.
Reversed and remanded to the Board for the imposition of reasonable conditions respecting the noise and odor emission issues.
NOTES
[1] Ten "land banked" stalls, reserved for possible future use, are planned on the westerly side of the site.
[2] The evidence established that the nearest residential dwelling in the residential neighborhood to the north is 190 feet from the proposed circular driveway.
[3] The only bulk variances required were relating to: (1) the number and size of the proposed loading spaces; and (2) proposed parking stalls within the fifty-foot buffer on the south-easterly corner of the property. Meridian's experts testified that the number (two instead of five) and size of the load spaces was rational planning because the number of deliveries to the site would be minimal, and the delivery trucks would be comparable to Fed Ex or UPS vehicles. The placement of the parking stalls within the fifty-foot buffer was in response to the Board's Technical Review Committee's recommendation that parking stalls, originally planned on the north side of the building closest to the residents, be moved to the south-easterly corner of the site. Neither the Board's professionals nor the Board members themselves objected to the bulk variance applications, and there is no basis on this record to deny them.
[4] The Board cites El Shaer v. Planning Bd. of Lawrence Twp., 249 N.J.Super. 323, 327, 592 A.2d 565 (App.Div.), certif. denied, 127 N.J. 546, 606 A.2d 360 (1991), for the proposition that, even if a proposed subdivision meets the bulk requirements of the land use ordinance, the planning board has the inherent power to deny the application it if has an adverse impact on surrounding properties. The El Shaer holding, however, was called into question by the Supreme Court in Pizzo Mantin Group, supra, 137 N.J. at 228, 645 A.2d 89.